UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

ROSS WILLIAM ULBRICHT,             :

                                            :

                    Petitioner        :                   19 Civ. 7512 (LGS)

               - v. -                     :

                                            :

UNITED STATES OF AMERICA,      :

                                            :

                    Respondent.     :

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 FOR AN EVIDENTIARY HEARING AND TO VACATE HIS CONVICTIONS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

Vladislav Vainberg
Michael D. Neff
Eun Young Choi
*Assistant United States Attorneys*
         *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 2

   A.  Ulbricht's Operation of Silk Road and Arrest ........................................... 2

     1.  The Silk Road Website ....................................................................... 2

     2.  Ulbricht Created, Owned, and Controlled Silk Road ......................... 3

     3.  Ulbricht Is Caught Red-Handed and Arrested ................................... 3

   B.  Pre-Trial Plea Negotiations ....................................................................... 5

   C.  The Trial .................................................................................................. 7

   D.  Ulbricht's Sentencing ............................................................................... 7

   E.  Ulbricht's Direct Appeal ........................................................................... 8

DISCUSSION ...................................................................................................... 9

     I.  Applicable Legal Standards Governing Ineffective Assistance of Counsel Claims .... 9

        A. Deficient Performance ....................................................................... 9

        B. Prejudice .......................................................................................... 11

     II.  Argument ............................................................................................. 12

        A. Ulbricht's Plea-Related Claims Are Meritless ................................. 12

          1.  Ulbricht's Counsel Provided Constitutionally Effective Representation...... 12

          2.  Ulbricht Was Not Prejudiced ..................................................... 16

        B. Ulbricht's Trial-Related Claims Are Meritless ................................. 19

          1.  Performance: Ulbricht Received Effective Assistance of Counsel .............. 19

          2.  Ulbricht Cannot Demonstrate Prejudice ..................................... 24

   CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Beras v. United States*, No. 05 Civ. 2678 (SAS), 2013 WL 1155415 (S.D.N.Y. Mar. 20, 2012) 15

*Chang v. United States*, 250 F.3d 79 (2d Cir. 2001)..............................................................14, 16

*Cox v. Donnelly*, 387 F.3d 193 (2d Cir. 2004)............................................................................. 11

*Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999)................................................................ 16

*Davis v. Greiner*, 428 F.3d 81 (2d Cir. 2005)............................................................................ 14

*Dodakian v. United States*, No. 14 Civ. 01188 (AJN) (SN), 2015 WL 11144511 (S.D.N.Y.
     Aug. 14, 2015) ...................................................................................................................... 12

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) .................................................................. 11

*Hill v. Lockhart*, 474 U.S. 52 (1985) ........................................................................................... 9

*Lafler v. Cooper*, 566 U.S. 156 (2012) ................................................................................... 9, 11

*Lynn v. Bliden*, 443 F.3d 238 (2d Cir. 2006) ............................................................................. 11

*Mayo v. Henderson*, 13 F.3d 528 (2d Cir. 1994) ....................................................................... 23

*Murden v. Artuz*, 497 F.3d 178 (2d Cir. 2007) .......................................................................... 10

*Neal v. United States*, No. 08 Cr. 86 (KBF), 15 Civ. 7665 (KBF), 2016 WL 2993200
     (S.D.N.Y. May 23, 2016)...................................................................................................... 16

*Pham v. United States*, 317 F.3d 178 (2d Cir. 2003) ............................................................12, 17

*Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009) ............................................................... 18

*Purdy v. United States*, 208 F.3d 41 (2d Cir. 2000).............................................................. passim

*Purdy v. Zeldes*, 337 F.3d 253 (2d Cir. 2003)............................................................................ 12

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................................... passim

*United States v. Aguirre*, 912 F.2d 555 (2d Cir. 1990)............................................................ 9, 25

*United States v. Bent*, 654 F. App'x 11 (2d Cir. 2016) (summary order)...............................17, 19

*United States v. Delgado*, No. 96 Cr. 126 (JFK), 2018 WL 895615 (S.D.N.Y. Feb. 13, 2018) .. 14

*United States v. Frederick*, 526 F. App'x 91 (2d Cir. 2013) (summary order) ........................... 12

*United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998)....................................................10, 16, 17

*United States v. Key*, No. 12 Cr. 712 (SHS), 2019 WL 2314693 (S.D.N.Y. May 31, 2019) ....... 18

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)........................................................ 8, 18, 24

*Vargas v. United States*, 951 F. Supp. 2d 531 (S.D.N.Y. 2013).................................................. 12

*Wang v. United States*, 458 F. App'x 44 (2d Cir. 2012) (summary order).................................. 16

*Zandi v. United States*, 460 F. App'x 51 (2d Cir. 2012) (summary order).................................. 17

**Statutes**

18 U.S.C. § 1028 ................................................................................................................. 7

18 U.S.C. § 1030 ............................................................................................................. 4, 7

18 U.S.C. § 1956 ............................................................................................................. 4, 7

21 U.S.C. § 841 ............................................................................................................... 4, 7

21 U.S.C. § 846 ............................................................................................................... 4, 7

21 U.S.C. § 848 ................................................................................................................. 7

28 U.S.C. § 2255 ............................................................................................................... 1

U.S.S.G. ......................................................................................................................... 5, 6

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the motion filed by Petitioner Ross William Ulbricht ("Ulbricht" or the "Petitioner") for an evidentiary hearing and to vacate his convictions pursuant to 28 U.S.C. § 2255 (the "Petition").[1]  In the Petition, Ulbricht argues that his trial counsel was constitutionally ineffective for (1) providing deficient advice regarding the Government's pre-Indictment plea offer; and (2) failing to adversarially test the Government's case at trial.  Both arguments are meritless.

Few cases have presented the sort of facts that Ulbricht's case did: (1) he was caught red-handed running a massive dark-web marketplace, which sold over $200 million in contraband, mostly illegal drugs; (2) Ulbricht kept a written journal describing when, why, and how he had created that marketplace; (3) he had admitted to a friend, in person, that he had created that marketplace; (4) he had commissioned, and paid for, at least five (attempted) murders-for-hire to protect his marketplace; and (5) his Guidelines range upon conviction was literally off the Guidelines chart, recommending life imprisonment whether or not he pled guilty.  Ulbricht committed an unprecedented crime, caused grave harm, went to tremendously violent lengths to protect his drug empire, and kept a copy of his marketplace on his laptop.  The Government's sole plea offer exposed him to a life sentence and did not limit the Government's ability to present the aggravating facts to the Court.  In this situation, Ulbricht made a rational choice: he put the Government to its proof.  His lawyer, Joshua L. Dratel, Esq. ("Dratel"), assisted by Lindsay Lewis,

---

[1] The Memorandum of Law in Support of Ulbricht's Petition is cited as "Pet."  Ulbricht's Declaration in support of the Petition is cited as "Ulbricht Decl."  The Declaration of Joshua L. Dratel, Esq. is cited as "Dratel Decl."  Tr. refers to the trial transcript in this case.  Sent Tr. refers to the sentencing transcript, appended as Exhibit A.  In light of the Court's January 28, 2020 Order directing Dratel's submission to be filed under seal (Doc. No. 19), the Government respectfully requests permission to likewise redact quotations from the Dratel Declaration in this memorandum.

Esq. ("Lewis"), advised Ulbricht accurately; devised and vigorously delivered a logical trial strategy given the Government's evidence; and fought hard for Ulbricht at every phase of the case.

Because all of Ulbricht's claims are squarely contradicted by the record, including Dratel's sworn affidavit, and in any case do not demonstrate any cognizable prejudice to Ulbricht, based on the overwhelming evidence in this case, the Court should deny the Petition without an evidentiary hearing.

## **BACKGROUND**

**A.    Ulbricht's Operation of Silk Road and Arrest**

### **1.    The Silk Road Website**

From January 2011 until October 2, 2013, the "Silk Road" website hosted a sprawling black market on the Internet, where illegal drugs and other illicit goods and services were regularly bought and sold by the site's users.  Silk Road was an online black market of unprecedented scope and global reach that sold illegal drugs of virtually every variety and other illicit goods and services, including fake IDs and passports, computer-hacking tools and services, and money laundering services.  In total, more than 1.5 million transactions were conducted on Silk Road, involving more than 100,000 buyers and nearly 4,000 sellers.  The total value of these transactions exceeded $213 million (in U.S. currency).  Silk Road was accessible only on "The Onion Router" or "Tor" network, a special network of computers on the Internet, designed to conceal the true IP addresses of the computers on its network, thereby enhancing users' anonymity.  The only form of payment accepted on Silk Road was Bitcoin—a decentralized form of electronic currency, designed to be as anonymous as cash and therefore particularly attractive to cybercriminals.

Silk Road charged a commission for every transaction on the site, generally 8 to 15 percent. During its operation, Silk Road generated sales revenue totaling over 9.9 million Bitcoins and

collected commissions from these sales totaling over 640,000 Bitcoins, worth more than $213 million and $13 million, respectively, based on the prevailing Bitcoin exchange rates at that time.

### 2. Ulbricht Created, Owned, and Controlled Silk Road

Ulbricht oversaw every aspect of the operation of Silk Road from the time he launched the site in early 2011 until his arrest in October 2013.  Among other things, Ulbricht set the commission rate for transactions on Silk Road; determined what goods were allowed to be sold on Silk Road; enforced the site's rules; managed the computer servers and code used to operate Silk Road; and managed the day-to-day operations of the site, with the help of his employees whom he hired, supervised, and paid.

Communications seized from the Silk Road server revealed that Ulbricht was willing to use violence to protect his interests in Silk Road, paying a total of approximately $650,000 to solicit murders-for-hire of at least five people.  (Unbeknownst to Ulbricht at the time, it appears that none of the intended targets was in fact murdered.)  Ulbricht's first murder-for-hire was intended to kill a Silk Road employee suspected of stealing more than $300,000 in Bitcoin from the site.  As to a different murder-for-hire, Ulbricht requested—and received from the hitman he had paid in Bitcoin—a photograph purporting to be of the slain victim.  Ulbricht replied, "I've received the picture and deleted it.  Thank you again for your swift action."

For most of the offense, Ulbricht used a particular nickname for his administrator account on Silk Road: "Dread Pirate Roberts," or "DPR" for short.  Ulbricht selected this nickname to "clear" his trail, since he had separately admitted to two people, in person, that he had created Silk Road but told them both, in 2011, that he had sold it.

### 3. Ulbricht Is Caught Red-Handed and Arrested

On October 1, 2013, Ulbricht was arrested while he was logged into Silk Road and acting as "Dread Pirate Roberts."  As law enforcement agents surveilled him that day, Ulbricht entered a

public library in San Francisco.   Shortly thereafter, an undercover agent who had been masquerading as "cirrus," a trusted member of Silk Road's small support staff, began chatting with "Dread Pirate Roberts." After the undercover agent confirmed that "Dread Pirate Roberts" was online and using his account, other agents arrested Ulbricht and seized his laptop—while it was open.   At the time of his arrest, Ulbricht was logged into Silk Road under the username "Dread Pirate Roberts," and was engaged in the conversation with the undercover agent.

Ulbricht's laptop contained voluminous evidence tying Ulbricht to the creation, ownership, and operation of Silk Road for the length of its existence.   This evidence included (1) thousands of pages of chat logs with his employees; (2) journal entries describing his ownership and operation of Silk Road; (3) a weekly "to do" list regarding Silk Road–related tasks; (4) a copy of the Silk Road website; (5) a copy of the Silk Road website's database (which included information about Silk Road's users and their transactions); (6) a spreadsheet with information about the servers used to operate Silk Road; (7) the private PGP encryption key that "Dread Pirate Roberts" used to authenticate and encrypt his messages; (8) an expense report spreadsheet, listing expenses and profits related to Silk Road; (9) a spreadsheet listing Ulbricht's assets, which included a reference to Silk Road as an asset valued at approximately $104 million as of June 2012; and (10) copies of identification documents belonging to Silk Road staff members whom Ulbricht had hired and paid.

The Complaint, appended as Exhibit B, charged Ulbricht with conspiracies to commit (1) narcotics trafficking, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); (2) computer hacking, in violation of 18 U.S.C. § 1030(a)(2); and (3) money laundering, in violation of 18 U.S.C. § 1956(h). Across 33 pages, the Complaint related in detail the principal documentary evidence about Ulbricht's involvement in creating and running Silk Road as "Dread Pirate Roberts," Silk Road's distribution of hundreds of kilograms of illegal drugs and other illicit goods to well over 100,000

buyers (including more than 100 undercover purchases), and Ulbricht's commissioning a murder-for-hire, as recorded in Ulbricht's private messages.  (Compl. ¶¶ 14-45).

B.    **Pre-Trial Plea Negotiations**

Following Ulbricht's arrest, the Government engaged in informal plea negotiations with Ulbricht's counsel, which did not culminate in a written plea offer.  The Government orally conveyed its willingness to have Ulbricht plead to a three-count Information charging the same offenses as the Complaint.  (Ulbricht Decl. ¶¶ 4-5, Dratel Decl. ¶ 11).  The charges carried a mandatory minimum sentence of 10 years, and a maximum sentence of life imprisonment.  (Ulbricht Decl. ¶ 6).  The Government would not be limited in presenting the Court with the facts underlying Ulbricht's misconduct, and as Ulbricht understood, it would be free to argue for any sentence within the statutory range, including life imprisonment.  (*Id.*).  Ulbricht also understood that the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") associated with these charges recommended a sentence of life imprisonment.  (Ulbricht Decl. ¶ 18).

Specifically, the Guideline provisions[2] that would have been as equally applicable to this plea offer as governed his ultimate convictions included: a base offense level of 36 based on 60,720 kilograms of converted marijuana weight (based on 82.6 kilograms of cocaine, 26.8 kilograms of heroin, and 8.7 kilograms of methamphetamine) under U.S.S.G. § 2D1.1(a)(5); a 2-level increase for money laundering under U.S.S.G. §§ 2S1.1(a)(1), (b)(2)(B); a 2-level enhancement for use of violence or credible threats of violence based on the murders-for-hire under U.S.S.G. § 2D1.1(b)(2); a 2-level enhancement for distributing controlled substances via mass marketing by means of an interactive computer service under U.S.S.G. § 2D1.1(b)(7); a 2-level enhancement for maintaining a premises for the purpose of distributing a controlled substance under U.S.S.G.

---

[2] All references are to the 2014 edition of the Guidelines in effect during Ulbricht's sentencing.

§ 2D1.1(b)(12); and a 4-level increase for being an organizer or leader under U.S.S.G. § 3B1.1(a).
*See* Ex. C (Presentence Investigation Report or "PSR") (filed under seal), ¶¶ 94-103. After
accounting for a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1,
Ulbricht would have faced a Guidelines offense level of 45, two points higher than the maximum
level of 43, yielding a Guidelines "range" of life in prison.

In approximately January 2014, Dratel informed Ulbricht that the Government intended to
indict Ulbricht for engaging in a Continuing Criminal Enterprise ("CCE") if he did not accept the
Government's offer, which would increase the mandatory minimum sentence to 20 years if
convicted. (Ulbricht Decl. ¶ 7). Although the CCE offense would add two more Guidelines points,
that would have no effect on the final Guidelines recommendation of life imprisonment in
Ulbricht's case, because he was already above the maximum offense level. Ulbricht declined to
pursue the Government's oral plea offer. (*Id.* ¶ 22). On February 4, 2014, as forewarned, the
Government indicted Ulbricht on the CCE charge and the charges from the Complaint.

In the fall of 2014, following the denial of Ulbricht's pretrial motions to suppress virtually
all evidence in the case, Ulbricht authorized defense counsel to ███████████████████
█████████████████████████████████████████████████
███████████████████████████████████ Ulbricht declined to
pursue the original offer, and no further plea negotiations occurred. (*Id.*).

At the final pretrial conference in December 2014, Ulbricht, his counsel, and the
Government all confirmed that an oral offer was extended pre-Indictment. (Ex. D, 12/17/2014 Tr.
68). Ulbricht confirmed that he had declined the offer by not responding to it. (*Id.*). Ulbricht
raised no issues about his counsel's explanation of the offer and the attendant risks of proceeding
to trial.

### C.     The Trial

Ulbricht's trial—described in great detail below—lasted approximately three weeks, and resulted in a guilty verdict on all seven counts in Indictment S1 14 Cr. 68 (KBF): (1) distributing and aiding and abetting the distribution of narcotics, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 2; (2) doing so by means of the Internet, in violation of 21 U.S.C. §§ 841(h) and 841(b)(1)(A); (3) conspiring to distribute narcotics, in violation of 21 U.S.C. § 846; (4) engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; (5) conspiring to obtain unauthorized access to a computer, for purposes of commercial advantage and private financial gain and in furtherance of other criminal and tortious acts, in violation of 18 U.S.C. §§ 1030(a)(2) and 1030(b); (6) conspiring to traffic in fraudulent identification documents, in violation of 18 U.S.C. § 1028(f); and (7) conspiring to launder money, in violation of 18 U.S.C. § 1956(h).

### D.     Ulbricht's Sentencing

Judge Forrest sentenced Ulbricht on May 29, 2015.   Judge Forrest agreed with the Guidelines calculation in the PSR: an offense level of 50 (which was reduced to 43, since 43 is the highest number on the chart); a criminal history category of I; and a resulting Guidelines range of life imprisonment, which was Probation's sentencing recommendation.  (Sent. Tr. 24).

Judge Forrest found "ample and unambiguous evidence that Ulbricht commissioned five murders as part of his efforts to protect his criminal enterprise and that he paid for these murders." (*Id.* at 18-20).  The Court found that Ulbricht ordered the first murder despite learning that the intended victim had a wife and several children.  (*Id.* at 19).  When Ulbricht learned that another victim was with three other individuals, Ulbricht paid for a hit on all four of them.  (*Id.*).  Ulbricht's words in his journal entries describing these murders-for-hires were "the words of a man who is callous as to the consequences or the harm and suffering that [his actions] may cause others," the

judge noted.  (*Id.* at 75).  The Court denied Ulbricht's request to strike references in the PSR to the six overdose deaths tied to drugs purchased from Silk Road.  (*Id.* at 25-26).

The Court noted that while the Guidelines recommended a life sentence, she arrived at her sentence only after independently considering the factors set forth in Section 3553(a).  (*Id.* at 64).  As to the nature and circumstances of Ulbricht's offense, it was "a planned, comprehensive, and deliberate scheme"—a "worldwide criminal drug enterprise with a massive geographic scope"—and one which "posed serious danger to public health and to our communities."  (*Id.* at 66).  Judge Forrest noted that Ulbricht "spent years . . . designing carefully considered methods of avoiding legal detection both for yourself, for your vendors, and for your customers."  (*Id.* at 69).  She noted that Ulbricht approved the sale of cyanide on Silk Road, despite knowing it was a well-known assassination poison.  (*Id.* at 73).  Judge Forrest also found that Silk Road was "market-expanding," both creating and fulfilling a demand for drugs.  (*Id.* at 75).  Silk Road reduced barriers to access and facilitated deliveries of drugs worldwide, including to communities that lacked access to drugs before.  (*Id.* at 75-76).  The quantities of drugs sold were "staggering."  (*Id.* at 76).  Ulbricht's misconduct was "unprecedented."  (*Id.* at 87).  Ultimately, the Court sentenced Ulbricht principally to life imprisonment and forfeiture of $183,961,921.  (*Id.* at 90).

### E.    Ulbricht's Direct Appeal

On May 31, 2017, the Second Circuit denied Ulbricht's appeal and affirmed his conviction and sentence in all respects.  *See United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017).  In its decision, the Second Circuit noted, among other things, that "the evidence identifying Ulbricht as Dread Pirate Roberts was overwhelming."  *Id.* at 120.  The Second Circuit commended the District Court's extremely thorough and careful sentencing analysis, observing that the District Court "appreciated its important responsibility in considering a sentence of such magnitude and carried out that responsibility with care and prudence."  *Id.* at 134.  The Second Circuit held that the life

sentence was substantively reasonable and that "[c]ommissioning the murders significantly justified the life sentence," because they "separate[d] this case from that of an ordinary drug dealer, regardless of the quantity of drugs involved in the offense, and len[t] further support to the district court's finding that Ulbricht's conduct and character were exceptionally destructive." *Id.* at 131 & n.68, 132. Ulbricht appealed, and the Supreme Court denied his petition for a writ of *certiorari*.

## DISCUSSION

### I.   Applicable Legal Standards Governing Ineffective Assistance of Counsel Claims

A claim that counsel was constitutionally ineffective is evaluated under the two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Hill v. Lockhart*, 474 U.S. 52 (1985).  To prevail, a petitioner must (i) prove that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms," and (ii) prove prejudice from the alleged dereliction in counsel's performance.  *Strickland*, 466 U.S. at 687-88, 693.  Only if both elements are satisfied is a petitioner entitled to relief.  *Id.* at 687.

### A.   Deficient Performance

Under the first prong, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

A defendant is entitled to effective assistance of counsel in connection with plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 160 (2012).  "[D]efense counsel must give the client the benefit of counsel's professional advice on this crucial decision of whether to plead guilty." *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000) (citation and internal quotation marks omitted).  "As part of this advice, counsel must communicate to the defendant the terms of the plea

offer, and should usually inform the defendant of the strengths and weaknesses of the case against him as well as the alternative sentences to which he will most likely be exposed." *Id.* at 45 (citation omitted). To establish a Sixth Amendment violation, the defendant must establish that his attorney in fact failed to communicate a plea offer, or failed to provide objectively reasonable advice about the decision to plead guilty. *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998).

However, counsel need not expressly advise the defendant as to the ultimate decision of whether to in fact plead guilty; rather, "the ultimate decision whether to plead guilty must be made by the defendant," and a lawyer may not coerce a client into accepting or rejecting a plea offer. *Purdy*, 208 F.3d at 45. "Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because '[r]epresentation is an art,' and '[t]here are countless ways to provide effective assistance in any given case.' Counsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea . . . , whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." *Id.* (citing *Strickland*, 466 U.S. at 693).

In the context of an ineffective assistance claim relating to counsel's performance at *trial*, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. "Counsel's performance is examined from counsel's perspective at the time of and under the circumstances of trial." *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 688). Therefore, "'[j]udicial scrutiny of a counsel's performance must be highly deferential . . . [and] every effort [must] be made to eliminate the distorting effects of hindsight.'" *Cox v. Donnelly*,

387 F.3d 193, 198 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). "As a general rule, a habeas petitioner will be able to demonstrate that a trial counsel's decisions were objectively unreasonable only if there [was] *no* . . . tactical justification for the course taken." *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) (internal citation and quotation marks omitted) (emphasis added). For that reason, "[s]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable . . . and there is a strong presumption that counsel's performance falls 'within the wide range of reasonable professional assistance.'" *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689-90).

### B.   Prejudice

A petitioner must also show actual prejudice, which is a heavy burden. *Strickland*, 466 U.S. at 692-93. To prove prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner cannot prove prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.

To prove prejudice in the plea context, the defendant must prove that there is a reasonable probability that, but for counsel's errors: (i) he would have accepted a plea offer; (ii) the plea offer would not have been withdrawn by prosecution in light of the intervening circumstances; (iii) the court would have accepted the terms of the plea offer; and (iv) the "conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Lafler*, 566 U.S. at 164.

In evaluating prejudice, the Court "need not accept [the defendant's] self-serving, post-conviction statements that [he] would have pleaded guilty if properly advised." *Dodakian v.*

*United States*, No. 14 Civ. 01188 (AJN) (SN), 2015 WL 11144511, at *14 (S.D.N.Y. Aug. 14, 2015), *report and recommendation adopted*.  "[I]n most circumstances a convicted felon's self-serving testimony is not likely to be credible." *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003). Rather, the defendant must provide a "sworn statement" that is "credible in light of all the relevant circumstances" and "accompanied by objective evidence."  *Vargas v. United States*, 951 F. Supp. 2d 531, 550 (S.D.N.Y. 2013) (citations and internal quotation marks omitted).  Objective evidence may come in the form of a "significant disparity" between the sentence recommended in the plea offer and the sentence imposed after a conviction at trial.  *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).  However, such a disparity in outcomes does not mandate a finding of prejudice.  Rather, "[e]ven with such a disparity . . . the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible."  *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013).

## II.    Argument

### A.   Ulbricht's Plea-Related Claims Are Meritless

#### 1.   Ulbricht's Counsel Provided Constitutionally Effective Representation

On the basic undisputed facts governing the plea negotiations in this case, Ulbricht fails to demonstrate any ineffective representation.  Ulbricht admits that his counsel fully and accurately communicated to him the terms of the Government's informal plea offer, including that it carried a statutory maximum sentence of life imprisonment, and the off-the-chart Guideline recommendation of life imprisonment.  (Ulbricht Decl. ¶¶ 4-7).  He admits, tersely, that defense counsel discussed certain pros and cons of pleading guilty, including the fact that there was a significant risk that he would be sentenced to life in prison even if he accepted the offer, *id.* ¶ 15, and the countervailing notion that defendants who go to trial and lose tend to suffer a "trial tax," *id.* ¶ 38.  Ulbricht admits that he knew the evidence against him was strong, based on what he

refers as "my undisputed creation and operation of the Silk road for a period of time," *id.* ¶ 24.  He admits that he was concerned about accepting the plea offer precisely "because it exposed me to a life sentence."  (*Id.* ¶ 9).  Accordingly, he engaged with defense counsel to propose counter-offers that would remove the district court's discretion to sentence him to life imprisonment, including proposing a 30-year cap, *id.* at 40-41, but the Government extended no such offers.  Ulbricht admits that he made the decision to decline the Government's uncapped offer.  (*Id.* ¶ 22).

Defense counsel extensively advised Ulbricht about the risks and benefits of the plea offer, leaving the ultimate decision to Ulbricht.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  In *Purdy*, the Second Circuit ruled that, even though counsel "never advised [his client] in so many words" as to whether to plead guilty, counsel was effective because he advised his client on the factors necessary to allow his client to make an informed decision, such as the strength of the government's case and other benefits of pleading guilty.  *Davis v. Greiner*, 428 F.3d 81, 89 (2d Cir. 2005) (alteration in original) (quoting *Purdy*, 208 F.3d at 47–48).  That is precisely what Dratel did here.  *See United States v. Delgado*, No. 96 Cr. 126 (JFK),

2018 WL 895615, at *5 (S.D.N.Y. Feb. 13, 2018) ("Failure to persuade a defendant to accept a guilty plea does not qualify as deficient representation.")

Ulbricht seeks to manufacture an ineffectiveness claim through tangential, incredible assertions that are internally inconsistent and explicitly contradicted by his former counsel in all material respects.  The Court need not credit Ulbricht's self-serving assertions where, as here, Dratel has submitted a detailed sworn affidavit describing his and his associate's communications with Ulbricht about the plea process, and candidly responding to each of Ulbricht's assertions.  Dratel's affidavit is the type of credible written testimony credited by courts without an evidentiary hearing in the face of "generic claim[s]" like Ulbricht's based "solely on his own highly self-serving and improbable assertions." *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001).

Ulbricht claims that his lawyers never explained "what the Government needed to prove to obtain a conviction on the counts in the Complaint." (Pet. 7).  To the contrary, Dratel, a defense attorney with nearly 40 years of experience, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  Moreover, aided by the 33-page Complaint and the highly incriminating evidence Ulbricht knew that the Government seized upon his arrest, Ulbricht knew the strength of the case against him. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Ulbricht also claims, implausibly, that his counsel advised him the plea offer was "too risky" and he had "nothing to lose by rejecting the plea deal," because it would not change his Guidelines sentencing exposure.  (Ulbricht Decl. ¶¶ 17-18).  But Dratel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Moreover, Ulbricht acknowledges that he understood the concept of a "trial tax," and was explicitly counseled that defendants who go to trial and lose tend to receive a harsher sentence.  (Ulbricht Decl. ¶ 38).

Finally, Ulbricht claims that his counsel was deficient by not discussing the prospect of pleading open to the Indictment.  (*Id.* ¶¶ 43-44).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  "[C]ounsel's failure to persuade [the defendant] to plead guilty cannot, without more, constitute unreasonable performance under *Strickland* . . . [t]he fact that [petitioner] now regrets the choice he made does not mean that his counsel acted unreasonably."  *Beras v. United States*, No. 05 Civ. 2678 (SAS), 2013 WL 1155415, at *17 (S.D.N.Y. Mar. 20, 2012).  Having already rejected a plea offer to lesser charges in the Complaint, there is no reasonable basis to believe that any specific advice on pleading "open" to an Indictment with more charges was required or would have altered Ulbricht's decision to go to trial.[3]

---

[3] Ulbricht also claims he would have pleaded guilty to avoid a CCE charge, Ulbricht Decl. ¶ 26, but does not articulate how counsel was deficient in any way where counsel accurately conveyed the Government's intent to indict Ulbricht on that charge if he did not accept the oral plea offer.

The Court may decide a motion based on ineffective assistance of counsel on the written record where, as here, the movant's allegations lack credibility and are contradicted by the record. *See*, *e.g.*, *Wang v. United States*, 458 F. App'x 44, 46 (2d Cir. 2012) (summary order) (reasonable for court to decide petition on written record where petitioner's allegations were "incredible in and of themselves" and were contradicted by other affidavits and plea colloquy); *Neal v. United States*, No. 08 Cr. 86 (KBF), 15 Civ. 7665 (KBF), 2016 WL 2993200, at *1 (S.D.N.Y. May 23, 2016) ("The combined submissions of the parties provide a sufficient basis upon which to deny the petition, and the Court concludes that a full testimonial evidentiary hearing would not offer any reasonable chance of altering its view on the facts as alleged by Neal, including the details added in his petition.") (citing *Chang*, 250 F.3d at 86).

In light of (1) the undisputed facts, (2) Dratel's credible and detailed affidavit, and (3) the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 669, Dratel's advice—regarding the terms of the government's plea offer, *see Purdy*, 208 F.3d at 45, the strengths and weaknesses of the government's case, *see id.*, the identical sentencing exposure between proceeding to trial and accepting the plea offer, *see Gordon*, 156 F.3d 376 at 380, and the desirability of the plea, *see Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999)—fell within an objective standard of reasonableness.

### 2.   Ulbricht Was Not Prejudiced

Even if Ulbricht were able to demonstrate that counsel's plea-related performance were deficient—and he cannot—Ulbricht would not be entitled to relief because he is unable to establish prejudice.  Ulbricht offers only the threadbare, generalized assertion that he "would have accepted the plea offer" (or pleaded open) if counsel had explained the elements the Government had to prove at trial, and conveyed the notion that a court may sentence a defendant more leniently upon a plea.  However, "a defendant may not rely solely on his own, self-serving statement post-verdict

16

that he would have accepted a more favorable plea deal." *United States v. Bent*, 654 F. App'x 11, 13 (2d Cir. 2016) (summary order); *see also Zandi v. United States*, 460 F. App'x 51, 52–54 (2d Cir. 2012) (summary order) (rejecting, without a hearing, defendant's argument based on his sworn affidavit that he would have accepted a plea offer). Because Ulbricht entirely fails to offer any "objective evidence" supporting his claims, no prejudice can be found. *Gordon*, 156 F.3d at 381.

Due to the magnitude of Ulbricht's crimes, this is a case in which there was *no disparity*, much less a "significant disparity," *Pham*, 317 F.3d at 182, between the sentencing exposure associated with the Government's plea offer and the sentence actually imposed. Ulbricht faced a Guidelines recommendation of life in prison in both instances. Ulbricht cites no authority finding prejudice in a no-disparity context, nor is the Government aware of any.

The record reflects that Ulbricht knew that by pleading guilty, he would be held responsible for being the architect of a novel, market-expanding online drug empire that delivered "staggering" quantities of drugs worldwide over several years and that he had commissioned at least five murders-for-hire to protect his criminal enterprise. He knew that there was a significant likelihood that he would be sentenced to life imprisonment after a conviction upon either a plea or trial. He authorized Dratel to present counter-offers that would have capped his statutory sentencing exposure; when the Government rejected those offers, Ulbricht made the "rational calculation," *Purdy* 208 F.3d at 47, to try to avoid the conviction.

Ulbricht's claim that he would have received a below-Guidelines (non-life) sentence if he had pleaded guilty is pure speculation. At sentencing, the Court did not fault Ulbricht in any way for proceeding to trial. The Court made clear that a life sentence was justified by the immense and unprecedented harm that Silk Road brought to communities worldwide; by Ulbricht's role as the mastermind and architect of that site; and by Ulbricht's ordering at least five murders, which the

Second Circuit agreed "significantly justified the life sentence," *Ulbricht*, 858 F.3d at 131 n.68. *See Puglisi v. United States*, 586 F.3d 209, 218 (2d Cir. 2009) ("[T]he district court's numerous statements concerning the severity of the conduct at issue undermine any assertion by the appellant that he would have received the benefit of a lenient plea agreement.").

Ulbricht recites the sentences of certain other Silk Road defendants who pleaded guilty, including administrators and drug vendors, to claim that he was prejudiced by going to trial.  (Pet. 17-19).  This argument is specious, as those co-conspirators' conduct was categorically different from Ulbricht's, who was the architect and leader of the illegal enterprise.  The administrators worked for Ulbricht; they essentially provided customer support and made a fraction of the millions of dollars that Ulbricht made as the owner and leader of Silk Road.  The vendors were responsible for their own drug sales, and when they made a sale, Ulbricht got the commission; Ulbricht facilitated *all* drug (and other contraband) sales through Silk Road.  None of these sentenced co-conspirators commissioned any murder-for-hires.

Thus, because Ulbricht "has not made any showing of what sentence he would have received pursuant to a plea agreement, he has not demonstrated that he experienced prejudice" due to counsel's representation during plea negotiations.  *United States v. Key*, No. 12 Cr. 712 (SHS), 2019 WL 2314693, at *3 (S.D.N.Y. May 31, 2019) (citations and quotation marks omitted). Because Ulbricht's "claim of prejudice [is] implausible on its face, and he identifies no evidence that he could . . . introduce[] at an evidentiary hearing that would . . . help[] him establish prejudice," a hearing would be fruitless and the petition should be denied without a hearing.  *United States v. Bent*, 654 F. App'x 11, 14 (2d Cir. 2016) (summary order) (affirming district court's denial of habeas petition based on ineffective assistance during plea negotiations without an evidentiary hearing).

### B.   Ulbricht's Trial-Related Claims Are Meritless

As to the trial, Ulbricht criticizes Dratel for (1) conceding that Ulbricht created Silk Road, and (2) stipulating that narcotics were sold on Silk Road between September 2011 and May 2013. (Pet. 19-21).   Ulbricht focuses solely on these two concessions, while ignoring the circumstances that necessitated them and distorting their purported significance.   When one considers the actual record of the case, it becomes clear that these two isolated decisions were reasonable, thoughtful, informed, and strategic.   Both decisions were better for Ulbricht than any alternative Dratel had. Ulbricht cannot show deficient performance or prejudice.

### 1.   Performance: Ulbricht Received Effective Assistance of Counsel

By way of context, the Government's evidence at trial consisted largely of testimony by law enforcement agents who spent years investigating Silk Road through undercover purchases and online communications with the man who administered it using the alias "Dread Pirate Roberts" (or "DPR").   Despite "DPR"'s efforts to mask the location of Silk Road, law enforcement ultimately identified the servers hosting Silk Road (and seized the trove of data they contained, documenting thousands of transactions and communications).   The Government also elicited testimony about Ulbricht being caught red-handed administering the site in 2013.   Ulbricht's college friend, Richard Bates, also testified that Ulbricht had admitted to Bates in 2011 that Ulbricht created and ran Silk Road; Ulbricht repeatedly asked Bates for programming assistance.

Anticipating this strategy, Dratel devised a nuanced defense theory that (1) explicitly denied all charges (Tr. 68-69); (2) articulated a clear theory based on an alternative perpetrator; and (3) maintained credibility by making certain strategic admissions.   Dratel's opening made the following points, among others, that attempted to navigate around the Government's evidence:

- Ulbricht created Silk Road as a "free market site that could sell anything *except* a couple of items that were harmful."   (Tr. 60) (emphasis added).   But "after a few months," it became "too stressful for him" so he "handed it off to others."   (Tr. 60-61).

- Ulbricht lawfully invested and traded Bitcoin.  That explained the $18 million in Bitcoin on his laptop, dramatically less than the amount flowing through Silk Road.  (Tr. 61, 65).

- At the time of his arrest, Ulbricht's computer was running "a peer-to-peer file sharing program that allows anyone access to your computer who is on that same network."  (Tr. 62-63).

- The "real DPR was paying for information about law enforcement investigations . . . [and] by September 13, he was warned that law enforcement was in possession of his real name, and that name is *not* Ross Ulbricht."  That compelled "the real DPR to put his escape plan into action and transfer the blame to Ross."  (Tr. 65) (emphasis added).  The true perpetrator "lured" Ulbricht back to "take the fall," and planted evidence on his computer.  (Tr. 61).

- "The real DPR is out there.  Silk Road II was online within six to eight weeks of Ross' arrest."  (Tr. 66).

- "The government's premise all along is that Silk Road was the product of a master computer programmer.  Doesn't fit Ross' profile."  (Tr. 66).

Dratel then pursued these theories throughout the trial—first on cross-examination, then through the limited defense case.  For instance, during the cross-examination of HSI Special Agent Jared Der-Yeghiayan, Dratel elicited that Der-Yeghiayan had investigated several other individuals and originally believed that Mark Karpeles was the mastermind behind Silk Road, and Karpeles' right-hand man, Ashley Barr, was "DPR."  Der-Yeghiayan acknowledged several facts about each man that had supported those beliefs, including that Karpeles is a software developer who specialized in ecommerce websites, bragged about his hacking on social media, purchased a Bitcoin exchange about one month before Silk Road launched, and owned the company that hosted a website on the regular Internet ("silkroadmarket.org") that explained how to access Silk Road through Tor.  (Tr. 527-30, 660-62).  Thus, Karpeles had the programming skills, the technological infrastructure, and the financial motive to run Silk Road.  Even as Der-Yeghiayan reviewed the materials on Ulbricht's laptop, he continued "looking for any associations with Mr. Karpeles," and in fact found his name in certain documents.  (Tr. 670).  Der-Yeghiayan admitted that at no time had he seen Karpeles' computer, cellphone, or had access to his overseas servers.  (Tr. 682).

Dratel's cross-examination—which drew on Der-Yeghiayan's emails, search warrant affidavit, and two-year investigation—vigorously sought to bolster the defense argument that an alternative perpetrator was to blame.  That is the very essence of adversarially testing the Government's case.

The cross-examination of FBI Computer Scientist Thomas Kiernan supplies another example of Dratel's vigorous advocacy on Ulbricht's behalf—pressing the theory that inculpatory evidence could have been planted on Ulbricht's computer.  Dratel elicited, among other things, that: (1) at the time of his arrest, Ulbricht's laptop had a peer-to-peer file sharing program open; (2) Ulbricht was in the middle of a download, which meant he had an open port, and the defense argued that constituted a security vulnerability which those with sophisticated technical skills could have exploited; (3) seven other computers in the world were connected to Ulbricht's computer, at the time of his arrest; and (4) although various TorChats had been saved on Ulbricht's computer, there was no way to tell if they had been generated on that computer in the first instance. (Tr. 1047-52, 1074-77).

Dratel also pursued the alternative perpetrator defense during his cross-examination of Ilhwan Yum (a former agent who conducted a Bitcoin analysis), eliciting *inter alia* that, about six weeks after Ulbricht's arrest, the FBI noticed that 195,000 Bitcoins were being moved—a quantity greater than the number of Bitcoins on Ulbricht's computer.  That 195,000 Bitcoin transaction was quickly broken up into three smaller transactions (Tr. 1745), which was consistent with an attempt to evade detection.

The defense called three character witnesses, who testified to Ulbricht's reputation for being peaceful, non-violent, and generous.  (*See* Tr. 2012, 2021.)  This testimony sought to bolster the alternative perpetrator defense by contrasting DPR—who used violence and attempted

murders-for-hire to protect his drug empire—with Ulbricht, who (according to these witnesses) was "peaceful," "kind," "generous," and "loving." (*Id.*).

In closing arguments, Dratel vigorously pressed the defense theory that Ulbricht left Silk Road before it transformed into a drug distribution network. (*See*, *e.g.*, Tr. 2218 ("Mr. Ulbricht was never a conspirator at the beginning or the end."); *id.* ("I want to establish a site where anyone can sell anything. Not a drug site, not an illegal site. Where anyone can sell anything. It sounds like Amazon. It sound like eBay."); Tr. 2199-2200 ("the government's last witness . . . said the first commission charge was May 16, 2011. There's no proof that Mr. Ulbricht was still involved at that time."); Tr. 2206 ("It's easy to reconstruct this in a way that would frame Mr. Ulbricht. Not only can it be edited, it can be moved from computer to computer over the Internet.")). And Dratel again raised alternative perpetrators, noting that Karpeles was "under investigation," "had computer expertise," "resources," "confederates," had companies that "were the original hosts for the Silk Road site," and "he also had the motivation": Karpeles "ran the primary bitcoin exchange in the world," and "Silk Road was a major player in the bitcoin market." (Tr. 2207-08). Dratel also noted various alleged differences between "DPR" and Ulbricht, from security practices to timeline to finances to use of violence. (*See*, *e.g.*, Tr. 2221). Finally, Dratel assailed law enforcement's investigation and the "pressure" agents faced to make an arrest. (Tr. 2209).

Thus, Dratel adopted a thoughtful and nuanced strategy, and vigorously tested the Government's case. The wisdom of any strategy must be assessed in context, including (1) the testimony of Richard Bates, and (2) the fact that Ulbricht was caught red-handed at the keyboard in October 2013. Bates, a college friend of Ulbricht's, provided detailed direct testimony that Ulbricht admitted to operating and maintaining the Silk Road website, which included in-person admissions during 2011. (Tr. 1095, 1106). Dratel received § 3500 material for Bates and devised

a strategy to provide a vigorous defense for Ulbricht, despite the two devastating facts enumerated above.  Dratel sought to thread the needle: He tried to maintain his credibility with the jury, while seeking an acquittal on all counts by arguing that the man arrested by law enforcement was a peaceful investor who was not the criminal mastermind that used violence as he ran Silk Road.

Dratel's acknowledgement that Ulbricht created Silk Road was virtually necessitated by Bates' testimony, which was corroborated by electronic communications.  ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████  Remarkably, Ulbricht's Petition never mentions Bates or his testimony, which plainly animated the trial strategy.  *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) ("In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of *the facts of the particular case*, 'viewed as of the time of counsel's conduct'") (quoting *Strickland*, 466 U.S. at 690) (emphasis added).  Had Dratel disputed Ulbricht's creation of Silk Road despite overpowering evidence of that fact, he risked losing credibility with the jury, thereby jeopardizing other defense arguments.  The acknowledgement that Ulbricht created Silk Road before quickly handing it off was *not* an admission that Ulbricht was involved in illegal activity; to the contrary, Dratel said that the website Ulbricht described sounded like Amazon and eBay—*i.e.*, websites engaged in lawful commerce.  (*See* Tr. 2218, 60).

Likewise, the fact that Ulbricht and Dratel entered into stipulations that illegal drugs were bought and sold from Silk Road was fully consistent with the defense theory of the case.  The stipulations essentially repeated the testimony of several witnesses, including (1) Michael Duch, a Silk Road drug dealer who sold more than 3 kilograms of heroin on Silk Road (Tr. 1498-1531);

(2) Richard Bates, who bought various narcotics on Silk Road (Tr. 1098); and (3) Der-Yeghiayan, who conducted more than 50 undercover purchases of narcotics on Silk Road, and seized thousands of packages containing narcotics from Silk Road (Tr. 76-98, 149-54, 167-68, 176).

Furthermore, the drug sale stipulations did *not* cover time periods at the beginning and the very end of the scheme, during which Dratel acknowledged (by necessity) that Ulbricht was associated with Silk Road. *See* Ex. E at 1-3 (GX 801, 801A) (narcotics purchased between January 2012 and April 2013);  4-7 (GX 802, 802A) (narcotics purchased between September 2011 and May 2013).  The defense remained free to argue that no drugs were sold on Silk Road when Ulbricht was involved.  The stipulations merely decreased the amount of time and attention spent on massive quantities of dangerous drugs, laboratory test results, and technical chain-of-evidence testimony.  This was not only reasonable, but helpful to the defense.  Dratel's performance was *well* within the "*wide* range of professionally competent assistance." *Strickland*, 466 U.S. at 690.[4]

### 2.   Ulbricht Cannot Demonstrate Prejudice

Ulbricht also cannot show prejudice from Dratel's trial strategy, because, as acknowledged by the Second Circuit, the evidence of Ulbricht's guilt was overwhelming. *Ulbricht*, 858 F.3d at 120 (noting that "the evidence identifying Ulbricht as Dread Pirate Roberts was overwhelming"). Ulbricht acknowledges this.  (Pet. 12 (arguing Ulbricht "did not have a legally viable trial defense.")).  Thus, there is no "reasonable probability" that anything Ulbricht claims Dratel should have done differently would have altered the outcome. *Strickland*, 466 U.S. at 694.  The evidence that Ulbricht created, owned, and operated Silk Road included, among other things:

- Caught Red-Handed: Ulbricht was arrested with his laptop open; he was logged into Silk Road as DPR, chatting online with an undercover agent who was posing as a member of DPR's support staff.  Ulbricht was logged in to the "mastermind" page.  (Tr. 384-99).

---

[4] The cases cited by Petitioner (Pet. 20-21) do not aid him, because their premise—that defense counsel conceded guilt—does not apply here.

-   <u>Ulbricht's Laptop</u>: Ulbricht's laptop contained voluminous evidence tying him to the creation, ownership, and operation of Silk Road, summarized *supra* at p. 4.

-   <u>Richard Bates</u>: As he built the site, Ulbricht solicited programming help from Bates; Ulbricht admitted to Bates that he was running an online marketplace for illegal drugs, which he showed to Bates—the Silk Road website.  (Tr. 1095, 1106, 1114-15, 1124-38).

-   <u>Marketing Posts Online</u>: Ulbricht tried to attract users to Silk Road by marketing the site on various online forums; those online posts were linked to an email address, rossulbricht@gmail.com, which was controlled by Ulbricht.  (Tr. 1252-68).

-   <u>Ulbricht's Apartment</u>: On the day of Ulbricht's arrest, agents executed a search warrant at his apartment.  During that search, agents seized handwritten notes from Ulbricht's trash bin that contained details about the revamped Silk Road vendor rating system that "Dread Pirate Roberts" had recently announced on the Silk Road forums.  (Tr. 405-09, 414-18).  Agents also recovered a thumb drive in Ulbricht's apartment that contained backup copies of the Silk Road website.  (Tr. 1018-32, 1091-92).

Given the overwhelming evidence, any deficiency in Dratel's representation (and again, there was none) would not have mattered; there is no reasonable probability that the outcome would have been any different.  *See*, *e.g.*, *Aguirre*, 912 F.2d at 562 ("strong Government case that was difficult to defend" militates against finding prejudice as a result of any challenged defense tactic).

## <u>CONCLUSION</u>

For the foregoing reasons, Ulbricht's claims are all meritless.  His Petition should therefore be denied without an evidentiary hearing.

Dated:  February 19, 2020
    New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York


By:            **/s/**
     Vladislav Vainberg
     Michael D. Neff
     Eun Young Choi
     Assistant United States Attorneys
