

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

> By **April 13, 2021**, the government shall file an affidavit by a person with knowledge confirming that no plea offer, as described in Petitioner's letter motion and attachment at 19 Civ. 7512 Dkt. No. 32, was communicated to Petitioner or to Petitioner's former counsel.
>
> The Clerk of Court is respectfully directed to file this Order in 19cv7512 and 14cr68.
>
> SO ORDERED.      Dated: April 9, 2021      New York, New York
>
> *[signature]*
> **LORNA G. SCHOFIELD**
> **UNITED STATES DISTRICT JUDGE**

Re:   *United States v. Ross William Ulbricht*, 14 Cr. 68 (LGS), 19 Civ. 7512 (LGS)

Dear Judge Schofield:

On April 2, 2021, petitioner Ross William Ulbricht filed a motion seeking (1) leave to amend his fully briefed, currently pending § 2255 petition; and (2) an order to obtain discovery so that he can amend this § 2255 petition. (*See* 19 Civ. 7512, Dkt. 32 (the "Motion")). The principal basis of the Motion is a *Vanity Fair* article. This article speculates that, if Ulbricht had pleaded guilty instead of proceeding to trial, he "likely" would have been sentenced to only a decade in prison. Based solely on this article, Ulbricht speculates that there must have been some "other," more favorable plea offer that his former counsel never told him about. That is not so. There was no "other" plea offer. There is no basis whatsoever—in law, in fact, in the record of this case, or in common sense—for the Motion. The Motion, which seeks a fishing expedition based upon speculation-on-speculation, should be denied.

### I.  Applicable Law

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). As the Second Circuit has said, "Rule 6(a) of the Rules Governing Section 2255 Proceedings . . . provides that a § 2255 petitioner is entitled to undertake discovery only when 'the judge in the exercise of [her] discretion and for good cause shown grants leave to do so, but not otherwise.'" *Lewal v. United States*, 152 F.3d 919, 1998 WL 425877 at *2 (2d Cir. 1998) (unpublished). A petitioner "bears a *heavy burden* in establishing a right to discovery." *Renis v. Thomas*, No. 02 Civ. 9256 (DAB) (RLE), 2003 WL 22358799, at *2 (S.D.N.Y. Oct. 16, 2003) (citing *Bracy*, 520 U.S. at 904) (emphasis added). To show "good cause," a petitioner must present "specific allegations" that give the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (citation omitted). "A court may deny a petitioner's request for discovery 'where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition.'" *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011) (citation omitted). "Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error." *Ruine v. Walsh*, No. 00 Civ. 3798 (RWS), 2005 WL 1668855, at *6 (S.D.N.Y. July 14, 2005) (citation omitted).

## II. The Motion: Conjecture-atop-Conjecture

The Motion has three premises. First, according a *Vanity Fair* article, Ulbricht's "sentence could have been a lot less severe. He was offered a plea deal, which would have likely given him a decade-long sentence, with the ability to get out early on good behavior. Worst-case scenario, he would have spent five years in a medium-security prison and been freed." (Motion, Ex. 1, at 6). Second, Ulbricht was aware of only one plea offer from the Government, but it did not fit the article's description—*i.e.*, Ulbricht was unaware of any plea offer that would have "likely" resulted in only a decade-long sentence. (Motion, 1). Third, Ulbricht concludes that there must have been some "other," "more favorable" plea offer that his counsel somehow never mentioned to him. (*Id.*)

## III. The Motion Is Contradicted by the Facts, the Record, and Common Sense

As a preliminary matter, the first premise (the *Vanity Fair* article) consists of nothing but rank speculation about what a criminal sentence "likely" would have been. This sort of guesswork is precisely what federal judges (at Rule 11 colloquies) tell defendants they *cannot* do: predict the ultimate sentence. But the *Vanity Fair* article goes even further: It predicts not only "a decade-long sentence" had Ulbricht pleaded guilty, but also a further 50% reduction for good behavior. (*See id.*, Ex. 1, at 6 (a guilty plea would have allowed Ulbricht "to get out early on good behavior," and so his "[w]orst-case scenario" was "five years" in prison)). Of course, under federal law, the maximum possible reduction for good behavior is <u>15%</u>, not 50%. *See* 18 U.S.C. § 3624(b). Thus, the conceptual lynchpin of the Motion is nothing more than uninformed opinion—and it appears in the broader context of an article that prioritizes dramatic flair over factual accuracy.[1] Federal judicial proceedings do not get reopened, nor briefing schedules reset, nor case files laid bare, based on such uninformed musings. (Were it otherwise, it would create perverse incentives for a defendant's supporters.) In sum, while Ulbricht asserts that this *Vanity Fair* article provides "good cause" (Motion, 1), this article does not even constitute "feeble cause"; it is no cause at all.

Proceeding to the second and third premises of the Motion: Simply put, **there was no "other" plea offer**. Ulbricht was not aware of any offer as lenient as the one the *Vanity Fair* article briefly implied, because no such offer ever existed. As the Government noted in its opposition to Ulbricht's § 2255 petition (*see* 19 Civ. 7512, Dkt. 21, at 5):

> Following Ulbricht's arrest, the Government engaged in informal plea negotiations with Ulbricht's counsel, which did not culminate in a written plea offer. The Government orally conveyed its willingness to have Ulbricht plead to a three-count Information charging the same offenses as the Complaint. (Ulbricht Decl. ¶¶ 4-5, Dratel Decl. ¶ 11). The charges carried a mandatory minimum sentence of 10 years, and a maximum sentence of life imprisonment. (Ulbricht Decl. ¶ 6). The Government would not be limited in presenting the Court with the facts underlying

---

[1] For instance, the *Vanity Fair* article poignantly described the (purported) part of the Ulbricht trial that was "perhaps hardest of all for the jury to watch"—the evidence of six people's deaths "from drugs they had purchased on Silk Road, including a teenager in Australia, who had had an adverse reaction to a hallucinogen and had jumped out of a hotel window." (Motion, Ex. 1, at 4-5). But the part of the trial that was purportedly "hardest" for the jury simply did not happen: As the trial transcript reveals, the six drug-related deaths were not part of the trial at all—only the sentencing.

Ulbricht's misconduct, and as Ulbricht understood, it would be free to argue for any sentence within the statutory range, including life imprisonment. Ulbricht also understood that the United States Sentencing Guidelines [range] . . . associated with these charges recommended a sentence of life imprisonment. (Ulbricht Decl. ¶ 18).

This was the one and only plea offer. At the final pretrial conference in December 2014, all relevant entities—Ulbricht, his counsel, and the Government—each confirmed that only one plea offer had been made (a pre-Indictment oral offer). Tellingly, the Motion does *not* mention the following crucial exchange, which was attached as an exhibit to the Government's opposition:

> THE COURT: Now, in terms of plea offers, has there ever been a time when the government has made a plea offer that has been conveyed to you?
>
> THE DEFENDANT: Nothing in writing, Your Honor, but there was a verbal offer.
>
> THE COURT: All right. Was that just one offer so far as you understood?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Mr. Dratel, is that your understanding; that there was one oral offer that was made?
>
> MR. DRATEL: Correct, Your Honor.
>
> THE COURT: Is that consistent with what the government believes has been extended to the defendant?
>
> MR. TURNER: Yes. Preindictment, Your Honor.
>
> THE COURT: And that was a preindictment plea offer?
>
> MR. TURNER: Yes.
>
> THE COURT: All right. Mr. Ulbricht, did you turn that offer down?
>
> THE DEFENDANT: I suppose by not responding, it was a declining, yes.

(Dkt. 21, Ex. D, at 3 (12/17/2014 Tr. 68)).

Finally, it should come as no surprise to Ulbricht that the Government's only plea offer had a Guidelines range of life imprisonment. Ulbricht committed an astonishing array of deliberate, sophisticated, harmful, profitable, unprecedented misconduct, including that (in short):

1. Ulbricht created, owned, and operated an extremely sophisticated black market website that was a platform for the sale of (1) nearly every illegal narcotic drug (*e.g.*, fentanyl, heroin, cocaine, crack, ecstasy, LSD, methamphetamine, and prescription pills); (2) firearms and ammunition; (3) computer hacking

    equipment; (4) money laundering tools and services; (5) fraudulent identification documents; and (6) poison such as cyanide;

2. For the entirety of Silk Road's existence (more than 2.5 years), Ulbricht oversaw every aspect of the site's operation, including setting the commission rate, enforcing the site's rules, managing the computer servers, supervising his small staff of employees, and deciding what could be sold on the site (*e.g.*, Ulbricht gave the go-ahead for the sale of cyanide, and even said he would be comfortable if human body parts were consensually sold on Silk Road);

3. Ulbricht commissioned, and paid for, the (attempted) murders of at least five people in order to protect his criminal enterprise;

4. The volume of users, and scope of transactions, on Silk Road were staggering: There were more than 1.5 million transactions, worth more than $200 million in total; there more than 115,000 buyer accounts and 3,000 seller accounts; and there were more than $183 million in narcotics sales, including more than 82 kilograms of cocaine and 26 kilograms of heroin;

5. Silk Road expanded the drug market and reached nearly every corner of the globe, lowering barriers to entry for many who might not have otherwise bought or sold drugs; and

6. Silk Road was unprecedented—it was the first site of its kind to combine various anonymizing technologies, and it spawned various copycat websites that have predictably plagued our society (and indeed the world) ever since.

Indeed, Ulbricht's Guidelines range was literally off the sentencing chart, even *before* considering the fact that he had commissioned and paid $650,000 for at least five murders to protect his empire (which, unbeknownst to him at the time, fortunately appear not to have resulted in any killings).

    In sum, for all of these reasons, the Government respectfully submits that the Motion should be summarily denied.

                                                  Respectfully submitted,

                                                  AUDREY STRAUSS
                                                  United States Attorney

                                     By: _____
                                             Michael D. Neff
                                             Vladislav Vainberg
                                             Assistant United States Attorneys
                                             (212) 637-2107/1029

cc:    Brandon Sample, Esq. (by ECF)
       Ross William Ulbricht (by mail)